O

1
2
3
4
5
6
7
8
9
10

# United States District Court
# Central District of California

11  IN RE A.L.C. and E.R.S.C.,

12  ANDREAS CARLWIG,                     Case No. 2:14-cv-1506-ODW(SHx)

13                    Petitioner,        **ORDER GRANTING PETITION**

14      v.                               **FOR RETURN OF CHILDREN TO**

15  SARODJINY CARLWIG,                   **SWEDEN [1, 3]**

16                    Respondent.

17                                       **I.  INTRODUCTION**

18          Before the Court is a discrete area of international law that presents a rare

19  instance where a federal district court must dip its toes into the waters of family law.

20  Petitioner Andreas Carlwig is seeking the expedited return of his two minor children

21  to Sweden pursuant to the Convention on the Civil Aspects of International Child

22  Abduction, done at the Hague on October 25, 1980 (the "Convention"), and its

23  implementing legislation, the International Child Abduction Remedies Act

24  ("ICARA"), 42 U.S.C. §§ 11601–11.  Respondent Sarodjiny Carlwig is the children's

25  mother and the wife of Petitioner.  She is currently in Los Angeles with the couple's

26  two children.  While the Court must make a foray into family law to adjudicate the

27  Petition, the Court notes that this is not a child custody proceeding.  The Court's role

28  is limited to determining where child custody proceedings should be held—the U.S. or

Sweden.   For the reasons discussed below, the Court **GRANTS** the Petition and **ORDERS** the return of A.L.C. and E.R.S.C. to Sweden for custody proceedings. (ECF Nos. 1, 3.)

## II. PROCEDURAL HISTORY

On February 27, 2014, Petitioner Andreas Carlwig ("Father") filed a Verified Petition for Return of Children to Sweden under the Convention.  (ECF No. 1, 3.)[1] The Petition was assigned to this Court on March 7, 2014.   Respondent Sarodjiny Carlwig ("Mother") was served with the Petition on March 13, 2014.  She chose to proceed in this matter unrepresented by legal counsel.

Mother filed a Response and Motion to Dismiss or Stay the Petition on March 27, 2014.  (ECF No. 20.)  On April 4, 2014, Father filed a Reply as well as separate responses to the affirmative defenses and Motions.  (ECF Nos. 24, 25, 26.)  Mother then filed an additional response titled Supplement (sic) Declaration of Respondent in Opposition to the Petitioner on April 8, 2014.  (ECF No. 35.)

On April 11, 2014, the Court held an all-day hearing on the Petition and Mother's affirmative defenses.  Having already thoroughly reviewed the parties' filings, the Court instructed the parties at the hearing to limit testimony to certain issues: the children's habitual residence and the affirmative defenses available to Mother.  Both Mother and Father testified at the hearing, and the parties called a handful of additional witnesses.  The Court also accepted additional exhibits into evidence.[2]  The Court's analysis and factual findings are based on all of the filings and exhibits in this case as well as the testimony at the April 11, 2014 hearing.

/ / /

/ / /

---

[1] The Verified Petition was incorrectly docketed by the clerk as an application for appointment of guardian ad litem, but the Petition was properly filed and date stamped on February 27, 2014.

[2] Father's additional exhibits are cited in this Order as "Hrg. Ex. #."  Mother's hearing exhibits were largely identical to the exhibits in her Response.  But Mother also submitted a packet entitled "Affirmative Defenses" at the hearing.  To the extent that documents in the packet are different or in addition to exhibits in the Response, the Court cites to the "Packet" and a page number.

### III.   FACTUAL BACKGROUND AND FINDINGS

Father and Mother married in Las Vegas, Nevada, on November 1, 2007. (Pet. 5:10, Ex. 3.)  Father is a citizen of Sweden.  (Pet. 5:4–6.)  Mother was born in India and is a citizen of both the U.S. and France.  (Pet. 5:7–8.)  Throughout their marriage, the family's residence has been largely dictated by Father's job assignments. Shortly after their wedding, the couple moved to Dubai, United Arab Emirates. (Pet. 5:20–24.)  Their first child, A.L.C., was born in Dubai in 2008.  (*Id.*)  A.L.C. is a citizen of both the U.S. and Sweden.  (*Id.*)

**A.   The Family's Move to Sweden**

In September 2011, Father's employer closed its operations in the U.A.E., and he was given a new assignment in Sweden.  (Pet. 6:1–8.)  Father commuted between Stockholm, Sweden and Dubai for the next three months.  (*Id.*)  He testified at the hearing that he was able to visit his wife and A.L.C. in Dubai every third weekend.

In January 2012, the entire family relocated to Stockholm.  (*Id.*)  Father and A.L.C. left first for Sweden, while Mother remained in Dubai to finish the last part of the move.  (*Id.*)  Mother contends that she was forced to move to Sweden and only agreed to a six-month trial period.  (Resp. ¶ 11.)  In her Response and at the hearing, Mother went into great detail about her residency status in Sweden and how the move to Sweden interrupted previous plans to move to the U.S.  (*See, e.g.*, *id.* ¶ 11.)  But the Court finds most of Mother's testimony regarding the move to Sweden irrelevant to the Petition and her affirmative defenses.  Ultimately, Mother acquiesced to the move and lived in Sweden with Father and A.L.C. for about thirteen months.

While living in Sweden, A.L.C. started preschool and began making friends. (Pet. 6:9–15.)  Father's relatives also live in Sweden and A.L.C. was able to spend time with his relatives including his grandparents, aunts, and cousins.  (*Id.*) Photographs of A.L.C. with his family in Sweden as well as a video were introduced into evidence at the hearing.  (Pet. Hrg. Exs. 25, 49.)  A.L.C. also took part in several extracurricular activities in Sweden including swimming, taekwondo, and soccer.

1  (Pet. 6:16–19.)  At the hearing, Father testified that he helped coach A.L.C. in soccer.
2  Father also helped take A.L.C. to school and picked him up afterschool.  (*Id.*)

3       When the family moved to Sweden in 2012, they moved into a rented
4  apartment.  The lease was for nine months and was later extended an additional three
5  months.  (Pet. Hrg. Ex. 3.)  Father was employed in Sweden and is still employed by
6  the same company he worked for in Dubai.  Mother was not employed while the
7  family lived in Sweden.  Mother admits that they left no belongings behind in Dubai.
8  (Resp. ¶ 12.)

9       In September 2012, while living in Sweden, Mother learned that she was
10  pregnant with the couple's second child—E.R.S.C.  (Pet. 6:20–26.)  The parties'
11  stories conflict with respect to how they welcomed the news of Mother's pregnancy.
12  But Father has submitted correspondence between the couple from the fall of 2012
13  suggesting that the couple's marriage was in a good place and that they were happy
14  about the pregnancy.  (*See, e.g.*, Pet. Hrg. Exs. 8–10.)

15  **B.    Mother's Departure to Los Angeles**

16       Father testified at the hearing that Mother first raised the possibility of traveling
17  to Los Angeles in November 2012 for the purpose of giving birth to E.R.S.C.  By all
18  accounts, Mother's pregnancy with E.R.S.C. was a difficult one.  The reason she gave
19  Father for wanting to give birth in Los Angeles was to be close to her friends—whom
20  she refers to as "family"—and because the birth of A.L.C. in Dubai was a bad
21  experience.  (*See, e.g.*, Pet. 6:27–7:3.)  Father ultimately agreed to the trip, but admits
22  he had reservations particularly with the idea of A.L.C. going with Mother while he
23  had to remain in Sweden for work.  (*Id.* at 7:4–9.)  Father purchased roundtrip tickets
24  from Stockholm, Sweden to Los Angeles for Mother and A.L.C., with a departure date
25  of January 16, 2013, and a return date of September 4, 2013.  (Pet. Ex. 4.)

26       Right before the scheduled departure date, Mother visited a doctor in Sweden
27  and learned that she had a low platelet count.  (Pet. 7:15–19.)  Concerned about her
28  health, the trip to Los Angeles was cancelled.  (*Id.*)  But Mother later changed her

mind and a new flight to Los Angeles was booked for herself and A.L.C.  (*Id.* at 8:13–9:2.)  They left for Los Angeles on February 27, 2013, while Father remained in Sweden.  (*Id.* at 9:3–12.)  Both Mother and Father admit to the existence of a note, written by Father, consenting to the trip to Los Angeles.  A handwritten note, apparently signed by Father, was submitted by Mother in her Response.  (Resp. Ex. 6.)  The note only states that Father consented to Mother taking A.L.C. to Los Angeles.  (*Id.*)  The note is silent as to the trip's purpose or duration.  (*Id.*)  Father maintains that the note is either a forgery or an earlier draft of the note.  (ECF No. 24 at 4:6–10.)  Father states that the final draft included that the trip was to be only four to six months in duration—enough time for Mother to give birth and recuperate.  Father's contention that the trip was only temporary is consistent with the round-trip tickets that were initially purchased for Mother and A.L.C.  (*See* Pet. Ex. 4.)

The Court notes that Mother testified and submitted various notes and correspondence to demonstrate that the parties had discussed moving to the U.S. at various points during their marriage.  (*See, e.g.*, Resp. ¶ 18, Exs. 1, 7.)  But none of Mother's submissions indicate that the parties reached an agreement to move to Los Angeles—or anywhere in the U.S.—in February 2013.[3]

**C.     The Time Spent in Los Angeles**

Once Mother and A.L.C. arrived in Los Angeles, Father attempted to regularly communicate with A.L.C.  At the hearing, Father testified that the parties tried to arrange a regular time for Skype calls, taking into account the time difference between Los Angeles and Sweden.

In May 2013, E.R.S.C. was born in Los Angeles.  Father made arrangements to take time off from work and travel to Los Angeles for the birth, though Mother

---

[3] The Court notes that around the time that Mother departed for Los Angeles with A.L.C. and through August 2013, Father was working on a project that could have sent him back to the U.A.E. (Resp. Exs. 7, 8.)  If the project panned out, there are emails and other correspondence that indicate Father's intention that Mother and the children join him in the U.A.E.  (*Id.*)  But a job in the U.A.E. never came to fruition.  (Pet. 11:21–26.)

ultimately asked him to stay away. (Pet. 9:22–10:3.) But Father did visit Los Angeles to see A.L.C. and E.R.S.C. in June and July of 2013. (Pet. 10:20–25.) Father stayed with Mother and the children in a temporary apartment. (*Id.*) During the visit, the family took a trip to Carlsbad, California, and Father testified that he and A.L.C. visited LegoLand together. (*See* Pet. Hrg. Ex. 12.) However, Father had to return to work in Sweden at the end of July. In the Petition, Father states that he suggested bringing A.L.C. back with him, but when Mother refused, he went home alone because the agreed-upon six months in Los Angeles had not passed. (Pet. 11:12–20.)

The Court finds that through at least August 2013, Mother sent Father mixed signals with regard to their relationship and even her intentions about remaining in Los Angeles. For example, Father proffered a Skype message from Mother dated August 1, 2013, which was sent the day Father returned to Sweden from visiting Los Angeles. (Pet. Hrg. Ex. 13.) In the message, Mother uses an intimate tone and suggests that the parties reconciled while Father was visiting.[4] (*Id.*) But at the same time that Father was in Los Angeles, Mother was attempting to have A.L.C.'s residency status altered in Sweden without Father's permission or knowledge. (*See, e.g.*, Pet. 12:4–12, Exs. 10, 11.) Father only learned of Mother's attempts after receiving a letter from the Swedish Tax Authority when he returned home. (*Id.*)

In August and September 2013, Mother and Father attempted to reach a resolution on where the family should live. But no resolution was reached, and Father never agreed to Mother remaining in Los Angeles with the children. A potential move to the U.S.—specifically New York City—was discussed, but in a series of emails it was clear that any move to the U.S. was conditional and that the parties never reached an agreement on the conditions. (*See* Resp. Ex. 9.) Father was only willing to move to the U.S. if both parties could find employment. (*Id.*) Father testified at the hearing that the company he currently works for does not have an office or subsidiaries in

---

[4] Mother's message also tends to discredit her allegations that Father sexually assaulted her during his visit. The allegations were first raised many months later after divorce and custody proceedings had been initiated by both parties.

New York City and he had no specific job prospects in the U.S.  In an email from September 29, 2013, Father reiterated to Mother that he never agreed to the children living permanently in Los Angeles.  (Pet. Hrg. Ex. 17.)  Mother also admitted on cross-examination that Father never agreed to a move to Los Angeles.

**D.     Legal Proceedings and Abuse Allegations**

Both parties filed for divorce.  On September 9, 2013, Mother filed for divorce in Los Angeles County Superior Court.  (Pet. Ex. 12.)  Father claims he was unaware of these proceedings until travelling to Los Angeles in November 2013.  (Pet. 12:19–13:23.)  Meanwhile, Father filed for divorce and custody of the children in Sweden in October 2013.  (*Id.*)  The couple remained in communication throughout this time and Mother was made aware of the proceedings in Sweden.  Father even submitted text messages from Mother in which she expresses shock and dismay that Father is unwilling to preserve the marriage.  (Pet. Hrg. Ex. 19.)

On November 2, 2013, Father traveled to Los Angeles with the children's grandfather.  (Pet. 13:17–23.)  Upon his arrival, he was served with a temporary restraining order that Mother had obtained from state court.  (*Id.*; Pet. Hrg. Ex. 30-7.)  The temporary restraining order was modified a few days later, allowing Father to have custody of A.L.C. while he was in town and visitation with E.R.S.C.  (Pet. 14:7–14.)

On November 10, 2013, Mother filed a police report alleging that Father sexually assaulted her during his visit to Los Angeles in June and July 2013.  (Pet. Hrg. Ex. 31.)  Mother reiterated these allegations in her Response and during the April 11, 2014 hearing on the Petition.  (*See, e.g.*, Resp. ¶ 58.)  Mother has also alleged that Father has been physically violent and verbally abusive throughout their marriage.  (*See id.*)  Most of her allegations are vague and the timing of the allegations—after both parties started legal proceedings—gives the Court pause.

/ / /

/ / /

## IV.   LEGAL STANDARD

The Convention is a treaty between multiple signatories wherein countries agree to cooperate in returning children to their home country for custody proceedings.  *See* Convention, art. 1; 42 U.S.C. § 11601(a).  In wrongful removal or retention cases, the Convention mandates that courts determine only the appropriate venue and not the underlying merits of the custody dispute.  *See* Convention, art. 16.  The court's task is limited to a determination of *where* a child custody action should be heard.  *See id.*; *Von Kennel Gaudin v. Remis*, 282 F.3d 1178, 1182 (9th Cir. 2002) ("The Convention does not extend to custody determinations.  Rather, the Convention simply restores the pre-abduction status quo by allowing for the return of a wrongfully abducted child.")  The Convention only applies to children under the age of sixteen.  Convention, art. 4.

To secure the return of a child under the Convention, a petitioner must make out a prima facie case for return by a preponderance of the evidence.   42 U.S.C. § 11603(e).  The petitioner must show that (1) prior to removal or retention, the child was a habitual resident in another signatory country, (2) the removal or retention was in breach of custody rights under the other country's law, and (3) the petitioner was actually exercising custody rights at the time of the removal or retention.  Convention, arts. 3–4; *see also Von Kennel Gaudin*, 282 F.3d at 1182.  If a prima facie case is established, then the court must order the prompt return of the child unless the respondent can establish one of five narrow affirmative defenses.  Convention, arts. 12–13, 20; *Von Kennel Gaudin*, 282 F.3d at 1182.  The best interests of the child is *not* a defense.  *See* Hague International Child Abduction Convention: Text and Legal Analysis, 51 Fed. Reg. 10494, 10510 (1986) [hereinafter "Public Notice 957"].

Petitions under the Convention are to be adjudicated using "the most expeditious procedures available."  Convention, art. 2.  While the normal rules of evidence generally apply, the Convention provides for flexibility with respect to authentication and judicial notice.  Documents or information related to an application

1   or petition under the Convention are admissible in court without authentication.  42

2   U.S.C. § 11605.  Courts are also instructed to take judicial notice of the laws and

3   judicial or administrative decisions of the state of a child's habitual residence.

4   Convention, art. 14.

5                          **V. PRIMA FACIE CASE FOR RETURN**

6          Having weighed all of the evidence, the Court finds that Father has met his

7   burden of establishing a prima facie case for the return of A.L.C. and E.R.S.C. to

8   Sweden.  The Court initially notes that the Convention applies to this case because the

9   U.S. and Sweden are signatories and both children are well under the age of sixteen.

10  *See* U.S. Hague Convention Treaty Partners, Bureau of Consular Affairs, Dep't of

11  State,        http://travel.state.gov/content/childabduction/english/country/hague-party-

12  countries.html; (Pet. 5:10–12).   Each element of Father's prima facie case—the

13  children's habitual residence, Father's custody rights in Sweden, and his exercise of

14  those rights—is addressed separately below.

15  **A.     Habitual Residence**

16         In determining the habitual residence of A.L.C. and E.R.S.C, the Court first

17  points out that the Petition is based on wrongful retention in the U.S. and not wrongful

18  removal.  The parties do not dispute that Father consented to Mother and A.L.C.

19  departing Sweden for Los Angeles while Mother was pregnant with E.R.S.C.  Where

20  the parties disagree is on the intended duration of the stay in Los Angeles.  Father

21  argues that the trip to Los Angeles was supposed to be for four to six months while

22  Mother gave birth and recuperated.  Mother contends that the parties agreed that she

23  was never returning to Sweden with A.L.C. and E.R.S.C., and that the children's

24  habitual residence is now the U.S.  Therefore, the Court must determine whether the

25  children are habitually resident in Sweden or the U.S.

26         The Convention does not define the term "habitual residence," but the Ninth

27  Circuit has provided an analytical framework to guide this Court in assessing the

28  habitual residence of A.L.C. and E.R.S.C.  In *Mozes v. Mozes*, 239 F.3d 1067 (9th Cir.

2001), the Ninth Circuit emphasized the importance of shared parental intent in determining a child's habitual residence.  Moreover, "the first step toward acquiring a new habitual residence is forming a settled intention to abandon the one left behind." *Mozes*, 239 F.3d at 1075.  An actual change in geography and passage of an appreciable period of time sufficient for acclimatization are also relevant to whether a child's habitual residence has changed.  *Id.* at 1078; *see also Papakosmas v. Papakosmas*, 483 F.3d 617, 622 (9th Cir. 2007).

The court in *Mozes* described three broad categories of cases when parents dispute the habitual residence of their children.  The first is where a family has relocated as a unit and "manifested a settled purpose to change its habitual residence, despite the fact that one parent may have qualms about the move." *Mozes*, 239 F.3d at 1076.  This scenario usually leads a court to find that a change in habitual residence has occurred.  *Id.* at 1076–77.  The second fact pattern is when a child's initial move from an established habitual residence was clearly intended to be of a limited and specific duration.  *Id.*  Courts in these cases will usually find that the changed intentions of one parent do not lead to a change in the child's habitual residence.  *Id.* The third scenario arises when the petitioning parent initially agreed that the child could stay abroad for a period of indefinite or ambiguous duration.  *Id.* at 1077.  These cases are very fact-dependent and usually have no clear answer.  *See id.* at 1077–78.

The facts of this case fall within either the second or third scenario articulated in *Mozes*.  But this case also presents some unique facts and circumstances, complicating the habitual-residence inquiry.  The Court turns first to the habitual residence of the eldest child A.L.C., and then addresses what appears to be an issue of first impression with regard to the habitual residence of E.R.S.C.

## 1.   A.L.C.'S Habitual Residence

Before A.L.C. departed Sweden with his mother on February 27, 2013, he was clearly a habitual resident of Sweden.  The family lived in Dubai, where A.L.C. was born, until the end of 2011 when Father's company shuttered its Dubai operations and

he was reassigned to Sweden.  (Pet. 5:20–6:8.)  In January 2012, the whole family made the move to Sweden.  (*See, e.g.*, Pet. 6:1–15; Resp. ¶¶ 10–13 )  Father brought A.L.C. to Sweden first, and Mother completed the move in Dubai and then followed her family to Sweden.  (*Id.*)  Mother admitted in her Response, and testified to the same, that nothing was left behind in Dubai when they left for Sweden.  (Resp. ¶ 12)  In Sweden, the family rented a furnished apartment for nine months.  (Pet. Hrg. Ex. 3.)  The lease was later extended an additional three months.  (*Id.*)  A.L.C. attended preschool and participated in a number of extracurricular activities including tennis, soccer, taekwondo, and swimming.  (*See, e.g.*, Pet. 6:16–19.)  Sweden is Father's home country, so A.L.C. was able to spend time with relatives including his grandparents.  (Pet. Hrg. Exs. 25, 49.)  While A.L.C. spent only about thirteen months total in Sweden, the length of time is not as important as the fact that the family had abandoned Dubai and A.L.C. had by all appearances a relatively stable and normal life in Sweden.  *See Mozes*, 239 F.3d at 1082 ("When a child has no clearly established habitual residence elsewhere, it may become habitually resident even in a place where it was intended to live only for a limited time.")

According to Father's testimony at the hearing, Mother first raised the idea of a trip to Los Angeles with A.L.C. in November 2012.  Mother was pregnant with their second child at this point and expressed a desire to give birth in the U.S.  A roundtrip ticket was purchased for both Mother and A.L.C. with a departure date of January 16, 2013, and a return date of September 4, 2013.  (Pet. Ex. 4.)  Prior to the planned date of departure, Mother visited a doctor and learned that she had a low platelet count. (Pet. 7:15–19.)  Due to health concerns, the trip to Los Angeles was cancelled at the last minute.  (*Id.*)  However, weeks later—despite no change in Mother's health or platelet count—Mother again wanted to leave Sweden for Los Angeles to give birth. (*Id.* at 8:13–9:12.)  Father ultimately agreed to the trip and permitted Mother to take A.L.C. with her.  (*Id.*)

/ / /

There are sufficient facts to demonstrate that Father only intended the trip to be temporary and last for a period of around six months.  Father had been active in A.L.C.'s life in Sweden, but did not travel with Mother and A.L.C.  Father made clear at the hearing that he had no job prospects in Los Angeles and that the family relied on his income.  In addition, in June 2013, Father registered A.L.C. at a new school in Stockholm that he was expected to attend starting in September 2013.  (Pet. 10:17–19, Ex. 9.)  This comports with Father's belief that the trip to Los Angeles was merely an extended stay.  Mother and A.L.C. also left belongings behind in Sweden. (Pet. 9:15–18.)

The Court found Mother's testimony and supporting evidence with regard to the parties' understanding about the trip to Los Angeles to be less than credible.  Mother testified at the hearing that Father "knew" that she and A.L.C. were never returning to Sweden.  But Mother could not explain to the Court the basis of Father's knowledge. Mother testified that the parties had always talked about moving to the U.S., but on cross-examination, Mother conceded that Father had never agreed to a move to Los Angeles.  Mother also proffered a handwritten note that Father signed consenting to Mother taking A.L.C. to Los Angeles.  (Resp. Ex. 6.)  While the Court has serious reservations about the validity of the note,[5] the note itself in no way indicates that the trip to Los Angeles with A.L.C. was intended to be permanent.  (*Id.*)  Furthermore, according to Petitioner at the hearing, Swedish law requires that both parents consent to a child being removed from the country.  Therefore, the Court gives little weight to the note as evidence of parental intent regarding the purpose and duration of the trip to Los Angeles.

Overall, the Court finds no shared intent to abandon Sweden as A.L.C.'s habitual residence.  Although the parties discussed a potential move to the U.S. at various times during their marriage, they did not agree on a move to Los Angeles or

---

[5] Mother argues that the note is the final version that Father signed.  (*See* Resp. ¶ 15.)  Father alleges that the note is a forgery or an earlier draft, and that the final version included the fact that he was only consenting to a temporary stay in Los Angeles.  (ECF No. 24 at 4:6–10.)

anywhere in the U.S. in February 2013 nor anytime thereafter.  Based on all the testimony and evidence submitted, the Court finds that Mother came to Los Angeles with A.L.C. and attempted to change the agreement with Father once she arrived. Regardless of whether Mother intended to deceive Father before leaving Sweden or she decided not to return once arriving in Los Angeles, the Convention was adopted to prevent her exact actions.  "The Convention is designed to prevent child abduction by reducing the incentive of the would-be abductor to seek unilateral custody over a child in another country.  The greater the ease with which habitual residence may be shifted without consent of both parents, the greater the incentive to try."  *Mozes*, 239 F.3d at 1079.  Mother was not happy in Sweden, but that did not give her license to make unilateral decisions regarding A.L.C.'s habitual residency.

The Court notes that Mother has supplied evidence of A.L.C.'s acclimatization here in the U.S., but this does not support a finding of a change in A.L.C's habitual residence.  *Id.* at 1079 ("Despite the superficial appeal of focusing primarily on the child's contacts in the new country . . . in the absence of parental intent,  courts should be slow to infer from such contacts that an earlier habitual residence has been abandoned.").  Moreover, Mother's attempts to alter A.L.C.'s status with the Swedish Tax Authority also lend no support to a change in A.L.C.'s habitual residence.  (*See, e.g.*, Pet. 12:4–12, Exs. 10, 11.)  Mother attempted to change A.L.C.'s status with Swedish authorities without Father's permission or knowledge, which actually bolsters this Court's assessment that Mother deceived Father as to the true purpose of the trip to Los Angeles.

The Court finds Father's testimony and evidence compelling and sufficient to meet his burden of establishing by a preponderance of the evidence that A.L.C. was a habitual resident of Sweden before Mother's retention of A.L.C. in the U.S.

## 2.     E.R.S.C.'s Habitual Residence

E.R.S.C.'s habitual residence presents a trickier question—the habitual residence of a newborn absent shared parental intent.  While the issue is complicated

by the fact that E.R.S.C.—unlike her brother A.L.C.—has never been to Sweden, the Court finds that its assessment of parental intent with regard to A.L.C. applies equally to E.R.S.C. and ultimately favors the same result as A.L.C.

E.R.S.C. was born here in the U.S., but a child's "place of birth is not automatically the child's habitual residence." *Holder v. Holder*, 392 F.3d 1009, 1020 (9th Cir. 2004); *see also Delvoye v. Lee*, 329 F.3d 330, 334 (3d Cir. 2003). Moreover, an infant's habitual residence is not established solely based on the location of the mother. *Nunez-Escudero v. Tice-Menley*, 58 F.3d 374, 379 (8th Cir. 1995) ("To say that the child's habitual residence derived from his mother would be inconsistent with the Convention, for it would reward the abducting parent and create an impermissible presumption that the child's habitual residence is wherever the mother happens to be.") Thus, E.R.S.C. is not a habitual resident of the U.S. simply because Mother is present here and desires to stay.

Although not identical to the circumstance at hand, the Third Circuit's holding in *Delvoye v. Lee*, 329 F.3d 330 (3d Cir. 2003), *cert denied*, 540 U.S. 967 (2003), is instructive on the habitual residence of a newborn like E.R.S.C. In *Delvoye*, the parents met and got pregnant in the U.S. 329 F.3d at 332. The father, who was from Belgium, convinced the mother to travel there and avoid the cost of giving birth in the U.S. *Id.* at 334. Shortly after the child's birth, the parents' relationship fell apart and mother and child returned to New York. *Id.* The father then filed a petition under the Convention arguing that the mother wrongfully removed the newborn from Belgium. *Id.* at 332. The court in *Delvoye* held that Belgium was not the newborn's habitual residence, because the parents lacked a "degree of common purpose" to habitually reside in Belgium with the child. *Id.* at 334. The mother was living out of suitcases in Belgium, had only a temporary visa, and left most of her belongings behind in New York. *Id.*

Like in *Delvoye*, the Court finds in this case that Father and Mother lacked a shared intent for E.R.S.C. to reside in Los Angeles or anywhere in the U.S. Father

only consented to Mother traveling to Los Angeles for E.R.S.C.'s birth—not for E.R.S.C. to remain in the U.S. permanently.   The Court acknowledges that the newborn in *Delvoye* was at least physically present in the U.S. when the court found the child to be habitually resident here as opposed to Belgium where the child was born, but the *Delvoye* court's holding emphasized parental intent and not physical presence in reaching its conclusion.  *Id.* at 334; *see also Whiting v. Krassner*, 391 F.3d 540, 550–51 (3d Cir. 2004) (expanding on the holding in *Delvoye* and emphasizing that acclimatization of a very young child "is not nearly as important as the settled purpose and shared intent of the child's parents.").

The Ninth Circuit has also emphasized the importance of shared parental intent in assessing the habitual residence of infants.  In *Holder v. Holder*, 392 F.3d 1009, 1020–21 (9th Cir. 2004), a ten-month old was found to be habitually resident in the U.S. because both parents were habitually resident in the U.S. at the child's birth.  The parents also did not intend to abandon the U.S. permanently when the family moved to Germany for the father's military assignment.  *Holder*, 392 F.3d at 1020–21.  Here, unlike in *Holder*, the Court finds that neither parent was habitually resident in the U.S. at E.R.S.C.'s birth.  Father was living and working in Sweden and still believed that Mother intended to return to him with both of their children.  While Mother may have formed the intent not to return by the time E.R.S.C. was born, she was hardly settled in the U.S.  Mother was unemployed, relied on Father for financial support, left many of her belongings in Sweden, and continued to negotiate a permanent residence with Father through at least August 2013.

Moreover, while the Ninth Circuit expressly declined to address whether an infant can acquire a habitual residence absent shared parental intent, the court in *Holder* did acknowledge that "it is practically impossible for a newborn child, who is entirely dependent on its parents, to acclimatize" independently of his or her parents. *Id.* at 1020–21.  Thus, this Court finds that E.R.S.C.'s young age suggests that she cannot simply acquire habitual residence here in the U.S. based on the ten months she

has spent here.  *See Whiting*, 391 F.3d at 550–51 (acknowledging the difficulty of determining the habitual residence of infants because they are not capable of forming "meaningful connections with the people and places" they encounter daily); *Nunez-Escudero*, 58 F.3d at 379 (holding that the habitual residence of an infant is not automatically where the mother is located).

The Court finds that the best approach to E.R.S.C.'s habitual residence is to look to the last location of shared parental intent, which is Sweden.  The Court believes that a location of some stability is more likely to be a child's habitual residence.  *Cf. Mozes*, 239 F.3d at 1082 (finding that that the children were habitually resident in Israel despite an agreement to an indefinite stay in the U.S. in part because "the economic base on which the family depended for sustenance remained entirely in Israel."); E.M. Clive, *The Concept of Habitual Residence*, Jurid. Rev. 127, 147 (1997) (theorizing that an infant may have no habitual residence until "living in a country on a footing of some stability.")  Here, the last location of any stability for the family was Sweden.  Sweden is where Father is employed.  Mother admitted at the hearing that she is unemployed here in the U.S. and relying on financial support from Father as well as government assistance.  In addition, the Court has already found that A.L.C.'s habitual residence is Sweden.  Splitting the children up for custody determinations in two countries is untenable.  For these reasons, the Court finds that E.R.S.C.'s habitual residence is Sweden and not the U.S.

**B.    Father's Custody Rights Under Swedish Law**

Removal or retention is wrongful where it is in breach of custody rights under the law of the country in which the child was habitually resident immediately before the removal or retention.  Convention, art. 3.  Custody rights may arise (a) by operation of law, or (b) by reason of judicial or administrative decision or an agreement having legal effect under the law of the country of habitual residence.  *Id.*  Here, the Court has found that the habitual residence of both children is Sweden.  Under Swedish family law, married parents have joint custody of children absent

some decree to the contrary.  Föräldrabalk[FB][Code Relating to Parents, Guardians, and Children]6:3(Swed.) (copy of code attached to Petition as Exhibit 15).  Father and Mother are married and have been married since before the children were born.  There is no judicial or administrative decision or legal agreement that contradicts or alters their joint custody under Swedish law.  Accordingly, Father has custody rights over both A.L.C. and E.R.S.C.

**C.    Father's Exercise of Custody Rights**

Father was also exercising his custody rights at the time Mother wrongfully retained the children in the U.S.  Courts should "liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child."  *Friedrich v. Friedrich (Friedrich II)*, 78 F.3d 1060, 1065 (6th Cir. 1996); *Asvesta v. Petroutsas*, 580 F.3d 1000, 1018 (accepting the standard for exercise of custody rights set forth in *Friedrich II*).  Delving any deeper into a petitioner's exercise of custody rights gets "dangerously close to forbidden territory: the merits of the custody dispute."  *Friedrich II*, 78 F.3d at 1065.

In this case, there is ample evidence that Father exercised his custody rights over both A.L.C. and E.R.S.C. at the time of Mother's wrongful retention.  Father was active in A.L.C.'s life in Sweden.  He lived with Mother and A.L.C., financially supported A.L.C., and even coached A.L.C. in soccer.  (*See, e.g.*, Pet. 6:16–19.)  After Mother and A.L.C. departed for Los Angeles, Father had regular communication with A.L.C. over the phone and on Skype.  While Father was not present at E.R.S.C.'s birth, it was not by choice.  He requested time off from work and made travel plans to Los Angeles for E.R.S.C.'s birth before Mother told him to stay away.  (Pet. 9:22–10:25.)  In addition, Father came to Los Angeles to visit both A.L.C. and E.R.S.C. in June and July 2013.  Despite what the Court finds to be Mother's attempts to thwart Father's contact with the children, Father has never stopped trying to maintain contact with his two children.  Father's contact with A.L.C. and E.R.S.C. is more than sufficient to meet his burden of establishing exercise of his custody rights.

# VI.   AFFIRMATIVE DEFENSES

Since the Court has found that Father has made out a prima facie case for return of the children by a preponderance of the evidence, the Court must order the return of the children unless Mother can prove one of the Convention's five narrow affirmative defenses.   *See* 42 U.S.C. §§ 11601(a)(4), 11603(e)(2).   One of the affirmative defenses—a mature child's objection—is inapplicable, but Mother has argued that the four remaining affirmative defenses bar return of the children to Sweden. Nevertheless, the Court finds that Mother has failed to meet her burden with respect to each of her affirmative defenses.

## A.   Consent or Subsequent Acquiescence

Mother's strongest affirmative defense is consent or subsequent acquiescence. Under the Convention, a court is not bound to order the return of a child if the respondent establishes that the petitioner consented to or subsequently acquiesced in the removal or retention of the child.   Convention, art. 13(a).   A court must make two distinct inquiries when considering this affirmative defense.   Consent involves the petitioner's conduct prior to the contested removal or retention, while acquiescence looks at whether the petitioner subsequently agreed to or accepted the removal or retention. *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001); *see also Friedrich II*, 78 F.3d at 1069.   A respondent must prove consent or subsequent acquiescence by a preponderance of the evidence.   42 U.S.C. § 11603(e)(2)(B).

The Court finds insufficient evidence that Father consented to the children becoming habitual residents in the U.S.   While consent does not have to be expressed with the same degree of formality that is required for subsequent acquiescence, a court should focus on "what the petitioner actually contemplated and agreed to in allowing the child to travel outside [his or her] home country."   *Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005).   Here, as has already been discussed at length above in assessing the habitual residence of the children, Father did not consent to either A.L.C. or E.R.S.C. remaining in the U.S.   Father allowed Mother to travel to Los Angeles with

A.L.C. to give birth to E.R.S.C.  Father only intended and consented to the trip lasting for four to six months—enough time for Mother to give birth and recuperate.  *See Baxter*, 423 F.3d at 371 ("The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute formal consent to removal or retention under the Convention.").

Mother relies heavily on the note from Father allowing Mother to take A.L.C. to Los Angeles.   But even if the Court believed the consent-to-travel note was legitimate—of which the Court is skeptical—the note would hardly operate as consent for Mother to reside permanently in Los Angeles with the children.  The note merely states that Father has consented for Mother to travel with A.L.C. and provides an address where they will "stay" while in Los Angeles.  (Resp. Ex. 6.)  The note does not indicate that Father is consenting to a permanent move to the U.S.  Mother also argues that she and Father had always talked about moving to the U.S.  But there is a distinction between talking about moving to the U.S. and actually consenting to the move at the time in 2013 when Mother brought A.L.C. to Los Angeles and gave birth to E.R.S.C.   Mother's supporting evidence only demonstrates that the couple discussed moving to the U.S. at various points in their marriage, but no definitive agreement as to location or time was ever reached.  Mother has failed to establish that Father consented to the move to Los Angeles.

There is also insufficient evidence to establish Father's subsequent acquiescence.  Acquiescence requires "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."  *Friedrich II*, 78 F.3d at 1070.  Mother has submitted no evidence of a formal renunciation of custody rights by Father.  Moreover, there is an utter lack of evidence of a "consistent attitude of acquiescence."   The Court acknowledges that after Father realized that Mother was not going to return to Sweden with the children, he took steps to mediate the dispute with Mother.  But at no time did Father agree to Mother remaining in Los

Angeles with A.L.C. and E.R.S.C.  Mother admitted during cross-examination at the hearing that Father has never agreed to living in Los Angeles.  In an email dated September 29, 2013, Father reiterated that he never agreed to a permanent stay in Los Angeles and continued to disagree with Mother retaining the children in Los Angeles. (Pet. Hrg. Ex. 17.)  Father did consider a move to New York City with Mother in August 2013, but he had certain conditions of which Mother was less than amenable. (Resp. Ex. 9.)  Discussions about potentially moving elsewhere in the U.S., if certain conditions such as finding a job are met, hardly amount to a "consistent attitude of acquiescence."

Moreover, the Court finds that Father's attempts to reach a resolution with Mother only further demonstrate a lack of acquiescence to Mother's unilateral move to Los Angeles.  *See Friedrich II*, 78 F.3d at 1070 (finding no acquiescence where father "resolutely sought custody" of his son since the abduction).  If he had ceased trying to negotiate a location that would make both of them happy or had simply let time pass with Mother and his children living in Los Angeles, then the Court would find acquiescence more likely.  But that is not the case here.  The Court has reviewed numerous emails as well as Skype and text messages sent over the duration of Mother's time in Los Angeles.  They all demonstrate Father's clear desire for the children to live in a location where both Father and Mother can reside—either in Sweden, the United Arab Emirates, or somewhere where Father could find work.  Los Angeles was never in the mix.   For these reasons, the Court also finds that Mother has failed to meet her burden of establishing Father's subsequent acquiescence to her wrongful retention of A.L.C. and E.R.S.C. in the U.S.

**B.    Grave Risk of Physical or Psychological Harm**

The next affirmative defense raised by Mother is grave risk of harm.  Under the Convention, a child should not be returned if there is a grave risk that the child's return would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation."  Convention, art. 13(b).  This affirmative defense

has a higher burden than consent or subsequent acquiescence and must be established by clear and convincing evidence.  42 U.S.C. § 11603(b).  When the grave risk of harm affirmative defense is raised, it is "not license for a court in the abducted-to country to speculate on where the child would be happiest."  *Friedrich II*, 78 F.3d at 1068; *see also Von Kennel Gaudin*, 415 F.3d at 1035 (quoting *Friedrich II* on the grave risk of harm defense).  Rather, the question before the court is whether the child would suffer "serious abuse that is a great deal more than minimal."  *Von Kennel Gaudin*, 415 F.3d at 1035 (internal quotations omitted).

Here, Mother has alleged that Father has been physically and verbally abusive.  She has also claimed that Father raped her on more than one occasion.  But the Court finds that Mother's allegations lack credibility.  For example, Mother filed a police report here in Los Angeles alleging that Father raped her multiple times while he was visiting in June and July 2013.  (Pet. Hrg. Ex. 31.)  But the Court questions the timing of the police report, which was not filed until November 10, 2013.  (*See id.*)  In the interim, the couple's marriage had completely fallen apart, Mother and Father had filed for divorce in different countries, and Father had announced his plans to seek return of the children to Sweden.  (Pet. 14:7–14, Ex. 12; Resp. Ex. 13.)   Even more telling is a Skype message sent by Mother to Father on August 1, 2013—the day Father returned from Sweden after visiting Los Angeles.  (Pet. Hrg. Ex. 13.)  In the message, Mother states that she misses Father and wants to hug and kiss him like she did while he was visiting.  (*Id.*)  Not only does the message suggest that any sexual relations were consensual while Father was in Los Angeles, but the message actually alludes to Mother being the one to reinitiate their romantic relationship.  (*Id.* ("I wanted to hug u and kiss u so many times but There was no space for that in your heart in the beginning But u finally let me it was nice to be able to put my head on your shoulder . . .").)  Mother's rape allegations months later stand in stark contrast to her intimate tone in the Skype message to Father the day he returned from the visit to Los Angeles—the visit during which he allegedly raped her.

Mother has also alleged that Father has been physically abusive toward her and has, on at least one occasion, physically pushed A.L.C. to the side during an argument. (*See* Resp. ¶ 62.)  But Mother's allegations of physical abuse are vague at best, and she has produced no additional evidence to corroborate her testimony.  Additional witness testimony and declarations filed with the Court provide no first-hand accounts of abuse and appear to be largely based on hearsay statements from Mother.  (*See e.g.*, Resp. Ex. 16.)  Even assuming that the Court found Mother's testimony credible, the Court does not believe that her allegations rise to the level of "serious abuse."  *Von Kennel Gaudin*, 415 F.3d at 1035.

In addition, Mother testified that Father's verbal abuse posed a grave risk of psychological harm to A.L.C. and E.R.S.C.  According to Mother's hearing testimony, A.L.C. has been attending therapy because he is afraid of Father and has witnessed Father's treatment of Mother.  But on cross-examination, Mother was less than forthcoming about A.L.C.'s therapy—at first refusing to provide the therapist's name and phone number and then only being able to provide a first name.  Mother also claimed to have video evidence of Father's verbal and emotional abuse toward A.L.C. When the Court inquired further, Mother played a cellphone video of Father bathing A.L.C.  The Court finds that the video actually demonstrates Father's extraordinary ability to keep his cool during a pretty intense temper tantrum from A.L.C., in which A.L.C. is throwing objects at Father.  Father's reaction was only a stern warning, and he did not get physical with the child.  The Court finds that Mother's allegations of physical and verbal abuse are insufficient to establish a grave risk of harm to the children.

Furthermore, to the extent that Mother claims that the return of the children to Sweden will cause psychological harm because of their attachments to Los Angeles, the Court finds this evidence irrelevant to the grave-risk inquiry.  *See Friedrich II*, 78 F.3d at 1068 (holding that a respondent cannot argue that a child has grown used to his

/ / /

1  surroundings as a basis of psychological harm, because "it is the *abduction* that causes

2  the pangs of subsequent return.").

3       The grave-risk-of-harm inquiry should also be limited to the degree of harm

4  that could occur to the children in the immediate future, which is "the period

5  necessary to obtain a custody determination" in the home country. *Id.* at 1037.

6  Moreover, courts that find a grave risk of harm must still order the return of the

7  children if the risk can be minimized or eliminated through some alternative remedy

8  or undertaking. *Von Kennel Gaudin*, 415 F.3d at 1037. Here, Father testified at the

9  hearing that if the Court ordered the return of the children to Sweden, he would pay

10  for Mother and the children to stay in an apartment separate and apart from him. The

11  Court believes that this alleviates any risk of physical or psychological harm to the

12  children until a Swedish court can make a custody determination.

13  **C.  The Well-Settled Defense**

14       Mother also argues that A.L.C. and E.R.S.C. are well-settled here in Los

15  Angeles, so the Court should not order their return to Sweden. A large portion of

16  Mother's evidence, including declarations and documentary evidence of A.L.C.'s

17  school and extracurricular activities in Los Angeles, go toward this defense.

18  Unfortunately, the well-settled defense is not available to Mother, because of the

19  timing of the Petition.

20       If proceedings under the Convention commenced more than one year after the

21  wrongful removal or retention, the Convention states that the child should not be

22  returned if the child has become settled in or accustomed to his or her surroundings.

23  Convention, art. 12. But the Convention is clear that the defense only applies if the

24  Petition has been filed more than one year after the wrongful removal or retention. *Id.*

25  Here, Mother and A.L.C. departed Sweden on February 27, 2013. The Petition was

26  filed in this Court exactly one year later on February 27, 2014. Moreover, the Court

27  has already explained that this case is not a wrongful-removal action but rather one for

28  wrongful retention of the children in the U.S. Although the Court has not articulated

1   an exact date when it became clear that Mother was not going to return with the
2   children, any date would necessarily fall after the date of departure from Sweden and
3   well within the one-year period.   Thus, the well-settled defense is unavailable to
4   Mother.

5   **D.   Human Rights and Fundamental Freedoms Exception**

6   The final affirmative defense that Mother has raised is one based on public
7   policy and fundamental human rights.   Article 20 of the Convention allows a court to
8   refuse to return a child "if doing so would violate fundamental principles relating to
9   the protection of human rights and fundamental freedoms."   This affirmative defense
10  must be established by the higher standard of clear and convincing evidence.   42
11  U.S.C. § 11603(e)(2)(A).   Moreover, it is almost never invoked and should only be
12  raised "on the rare occasion that return of a child would utterly shock the conscience
13  of the court or offend all notions of due process."   Public Notice 957, at 10510; *see*
14  *also Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 614 (E.D. Va. 2002).

15  Mother has proffered numerous news articles and Internet postings to argue that
16  Sweden is a racist country that will not welcome her children, who are of mixed race.
17  (Packet 74–93.)   However, a few examples of hate crimes and evidence of racist
18  sentiments among a portion of the Swedish population does not reach the level of
19  utterly shocking the conscience—especially when they do not involve the parties at
20  issue here.   Unfortunately, Sweden is not the only country where hate crimes and
21  racism exist, and many examples of similar crimes and sentiments can be found here
22  in the U.S.   Accordingly, the Court finds that the fundamental principles of human
23  rights and fundamental freedoms do not prevent this Court from ordering the return of
24  A.L.C. and E.R.S.C. to Sweden.

25  **VII.   CONCLUSION AND RETURN ORDER**

26  For the reasons discussed above, the Court hereby **GRANTS** the Petition for
27  Return of Children to Sweden.   (ECF Nos. 1, 3.)   The Court also **DENIES** Mother's
28  Motions to Dismiss and Stay the proceedings.   (ECF No. 20.)   The Court has

jurisdiction to hear the Petition under 42 U.S.C. § 11603(a), and a stay would contravene the Convention's instructions to "use the most expeditious procedures available" in adjudicating petitions.  Convention, art. 2.

The Court **ORDERS** that A.L.C. and E.R.S.C. be returned to Sweden for custody proceedings forthwith.  Father has stated that he will pay for Mother and the children to fly back to Sweden for custody proceedings.  He has also stated that he will pay for all three to stay in a place separate and apart from him during the pendency of custody proceedings.  Accordingly, the children are to return to Sweden in the custody of their mother Sarodjiny Carlwig.

Sarodjiny Carlwig is **ORDERED** not to leave the jurisdiction of the Central District of California until her departure with the children to Sweden.  The passports of Sarodjiny Carlwig and A.L.C. are being held by the Los Angeles County District Attorney's Office.  The Court **ORDERS** that the passports be released to Sarodjiny Carlwig upon a showing that a flight to Sweden has been booked and is imminent.

Father's counsel is to file weekly status reports with the Court on the progress of travel arrangements for the return of A.L.C. and E.R.S.C. to Sweden.  The first status report shall be filed **no later than Thursday, April 24, 2014**, with subsequent reports to be filed every seven days thereafter until the children have departed for Sweden.

**IT IS SO ORDERED.**


April 17, 2014



_____

**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**